**In re MID–TOWN PRODUCE TERMINAL, INC., Bankrupt.**

**G. J. SINCLAIR, Plaintiff-Appellant,**

v.

**James R. BARR, Trustee, Defendant-Appellee.**

**No. 78–1112.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted April 17, 1979.

Decided May 30, 1979.

Paul M. Buchanan, Wichita, Kan. (Curfman, Brainerd, Harris, Bell, Weigand & Depew, Wichita, Kan., with him on the brief), for plaintiff-appellant.

Frank R. Cobb, Wichita, Kan., for creditors-appellees.

James R. Barr, Wichita, Kan., filed a brief for defendant-appellee.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from an order of the district court partially affirming and modifying a decision of the bankruptcy judge denying G. J. Sinclair's reclamation complaint on a promissory note and security interest in accounts receivable of the bankrupt Mid-Town Produce Terminal, Inc. (Mid-Town). The district court allowed the claim on the promissory note but subordinated it to all other creditors' claims, and denied the security interest.

On appeal we must determine whether the denial of the security interest and subordination of the promissory note was proper under the equity powers of the court.

Mid-Town, a company engaged in the sale of fresh produce, was in serious financial difficulty in early 1975. At this time G. J.

Sinclair, his wife and son, Richard Sinclair, owned all of the Mid-Town stock; the elder Sinclair was president and his son was vice-president. After a demand by major suppliers, certain promissory notes were given, naming those suppliers in a security agreement collateralizing the indebtedness with a security interest in Mid-Town's office equipment and inventory. Not being fully satisfied with the security, these creditor-suppliers threatened to cease further deliveries unless they received payment of $20,000 cash on their accounts.

The sum of $20,000 was advanced to Mid-Town to enable it to make the payment demanded, through the personal account and over the signature of Richard Sinclair. When the suppliers were paid February 19, 1975, a corporate note and security agreement were executed in favor of G. J. Sinclair, designating the collateral as "all of debtor's accounts now existing or hereafter arising during this agreement." This was signed by Richard Sinclair as president of Mid-Town, a position he did not hold until June 5, 1975, when he was transferred all the shares owned by his parents. The evidence showed that G. J. Sinclair did not sign the security agreement as secured party until shortly after August 15, 1975. The instrument was filed with the Kansas Secretary of State on August 18, 1975. No corporate minutes of a stockholders' or directors' meeting show authorization for the security agreement.

On December 12, 1975, a corporate resolution was adopted directing the cessation of business operation and commencement of bankruptcy proceedings. The actual filing of Mid-Town's bankruptcy petition did not occur until December 22, 1975, four months and four days after G. J. Sinclair's security interest was perfected.

Section 60 of the Bankruptcy Act, 11 U.S.C. § 96, contains the rule that a transfer of property to a creditor from an antecedent debt is voidable if it occurs within four months of bankruptcy and the creditor had reason to know the debtor was insolvent at the time of the transfer. Section 67(a) of that Act, 11 U.S.C. § 107(a), deems any lien (an attachment, judgment, levy, or other process) obtained against a debtor's property within four months of bankruptcy to be null and void if the debtor was insolvent when the lien was obtained or it was obtained by fraud. Had Mid-Town's bankruptcy proceedings been instituted within four months of August 18, Sinclair's perfected security interest likely would have been invalidated under either of these provisions.

The bankruptcy judge found that at all material times Mid-Town was dominated by the two Sinclairs; in February, 1975, both knew the corporation did not have sufficient working capital to continue in business, and that Mid-Town's receivables constituted the corporation's major asset available for general creditors. The bankruptcy judge, purporting to exercise equity powers, disallowed the claim in its entirety, stating:

> Their execution of security documents on behalf of the *alter ego* corporation in an effort to create a receivables lien in favor of F. G. [sic] Sinclair as security for a loan he never made was, by all standards of equity and fair dealing, a proscribed use of insider powers for personal advantage to the distinct detriment of general creditors. (Footnote omitted.)

On appeal the district court declared that disallowance was improper, but subordinated G. J. Sinclair's claim to those of all other creditors. No attention was paid to the bankruptcy judge's reference to G. J. Sinclair's not having made the loan. Rather the court appeared to place the decision upon equitable power to subordinate controlling shareholders' claims simply because they are controlling shareholders:

> Bankruptcy courts have subordinated the claims of controlling shareholders based upon "loans" or "advances" even in the absence of fraud where the corporation lacked sufficient capital at the time the "loan" was made and became bankrupt within a few months afterward, either upon the theory that the "loans" were actually a contribution to capital, or upon the theory that equity will not permit the owner of an enterprise to shift

the inherent risks of the business to the ordinary creditors. See, *e. g., Braddy v. Randolph*, 352 F.2d 80 (4th Cir. 1965); *In re Sterling House, Inc.*, 356 F.Supp. 1113 (W.D.Va.1973). The proposition was perhaps best articulated by Judge Learned Hand, concurring in the holding of *In re [V.] Loewer's Gambrinus Brewery Co.*, 167 F.2d 318 (2 Cir. 1948), . . . .

The proceeds of the accounts collected by the trustee were approximately $25,000; hence, if the lien is upheld, little will be left for Mid-Town's general creditors.

We first consider whether an advance to a failing corporation by a dominant shareholder may be subordinated on that basis alone in a later bankruptcy proceeding. The cases relied upon by the district court are distinguishable. *Braddy v. Randolph*, 352 F.2d 80 (4th Cir. 1965), and *In re Sterling House, Inc.*, 356 F.Supp. 1113 (W.D.Va. 1973) were cases where the initial capitalizations of the corporations were grossly inadequate, requiring almost immediate shareholder loans and guarantees to operate. Because that was so, in essence the courts found the shareholders' so-called debt had to be treated as equity capital. *In re V. Loewer's Gambrinus Brewery Co.*, 167 F.2d 318 (2d Cir. 1948) involved claims of another corporation which had identical shareholders, officers and directors, shared common office space, with the debtor performing services for the creditor-claimant without charge, and whose identities were otherwise bound together. *See In re V. Loewer's Gambrinus Brewery Co.*, 74 F.Supp. 909 (S.D.N.Y.1947). It also was decided on the "pure instrumentality" rule now generally rejected. *See* Herzog and Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 *Vand.L.Rev.* 83, 108–110 (1961).

■ We are unwilling to find a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor. To hold the debt may be subordinated on that basis alone would discourage owners from trying to salvage a business, and require all contributions to be made in the form of equity capital. We do not think that is desirable as social policy, nor required by the cases.

■ *Comstock v. Group of Institutional Investors*, 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911 (1948) allowed the claim of a dominant shareholder in a bankruptcy reorganization, declaring:

It is not mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong.

The modern cases generally hold that claims for loans by majority shareholders will not be subordinated to claims of other creditors absent inequitable conduct. *See, e. g., Frasher v. Robinson*, 458 F.2d 492 (9th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972); *Spach v. Bryant*, 309 F.2d 886 (5th Cir. 1962); *Forbush v. Bartley*, 78 F.2d 805 (10th Cir. 1935). *See also*, 11A Collier on Bankruptcy § 16.-002[2.3] (1978).

■ Because there is incentive and opportunity to take advantage, dominant shareholders and other insiders' loans in a bankruptcy situation are subject to special scrutiny. *Pepper v. Litton*, 308 U.S. 295, 306–307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) declared:

Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, [41 S.Ct. 209, 212, 65 L.Ed. 425]. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. (Footnote omitted.)

We agree with the summary of the law made by Herzog and Zweibel, *supra*, 15 *Vand.L.Rev.* at 112, after analyzing hundreds of cases:

To recapitulate: mere control or domination of a corporation is not proscribed by law and is in itself insufficient to justify piercing the corporate veil and subordinating claims. The fiction of a separate legal entity will be respected unless to the elements of domination and control are added certain factors which will motivate the bankruptcy court, sitting as a court of equity, to disregard the fiction. These "plus" factors may be fraud, plain and simple, or a history of spoilation, mismanagement and faithless stewardship which is tantamount to fraud; they may be simply the violation of rules of fair play and good conscience which amounts to a breach of the fiduciary standards of conduct owed to the corporation, a use of the powers of an "insider" for personal advantage to the detriment of creditors—all of which constitutes a "wrong" which equity will undo or intervene to prevent.

Appellant has presented the instant case to us as one where the controlling shareholders are wholly innocent of any scheme to defraud or inequitable conduct. Admittedly there was no notice to general creditors when G. J. Sinclair obtained the security interest and no notification to creditors when it was filed with the Secretary of State. But the money advanced to the corporation in February was utilized to pay creditors who already had a perfected security interest. The payment reduced those creditors' claims and enabled Mid-Town to stay in business a while longer. It is argued there is no evidence any creditor relied upon the absence of a filed security agreement; and creditors could have destroyed the priority of the G. J. Sinclair lien by forcing Mid-Town into bankruptcy before December 18.

It is also argued that if the parties deliberately planned to mislead creditors in this ·case, they were quite inept. Surely one seeking priority, who controlled the corporation, would have had minutes of a directors' meeting documenting the granting of the security agreement; there was none here. Also, it is likely the security agreement would have been filed much sooner. The parties would not have made the mistake of having Richard Sinclair sign as President, a position he did not occupy until June 5. A clever manipulator would have let time continue to pass after December 22, and forced the creditors themselves to impress involuntary bankruptcy upon Mid-Town as far beyond the four-month period as possible.

We have problems with that analysis, however. First, while it is not a numbered finding of fact in his opinion, the bankruptcy judge declared that G. J. Sinclair seeks priority "for a loan he never made." We are not sure that means the advance was considered a contribution to capital, or that it was a loan made by Richard rather than G. J. Sinclair.

In a case like this the usual procedure is to first determine whether the transaction was a contribution to capital rather than a loan. Relevant facts are the initial operating capital of Mid-Town and the length of time it was in operation, both absent from the record on appeal. The promissory note and security agreement treat this as a loan by G. J. Sinclair. But the promissory note of Mid-Town to G. J. Sinclair dated February 19, 1975, is signed by Richard Sinclair as President, a position he did not hold until June 5, 1975. The stipulation of facts states "the date of formal execution of Exhibit 'B' to Plaintiff's petition [the promissory note] is unknown but reference to a signed copy of this note is contained in a letter from Plaintiff's attorneys to Plaintiff under date of August 15, 1975." The note itself calls for payments of "Interest and Principal in the amount of $267.86 . . . per month, until paid in full." But nowhere on the note does the interest rate appear. Nor does there appear ever to have been any monthly payments made. Admittedly the security agreement was signed between August 15, 1975, and its filing date three days later. Where facts indicate that ostensible loans were not repaid according to their

terms, and no interest paid, they may in reality be capital contributions. *L & M Realty Corp. v. Leo*, 249 F.2d 668 (4th Cir. 1957).

Assuming this advance is found to be debt, the next inquiry is whether there was any fraud or sharp dealing requiring subordination under the "inherent fairness" doctrine. There is nothing in the record to indicate creditors actually relied and were prejudiced by the delay in filing, or that the creditors paid the $20,000 in February would not have continued to do business had they known this advance to Mid-Town was being treated as a loan secured by the accounts receivable. Reliance by creditors would be relevant, perhaps essential on this aspect. Nothing appears in the record before us as to mismanagement and "faithless stewardship," except the fact the business was in trouble in February, 1975, and continuously thereafter. The bankruptcy schedules show federal unemployment taxes (Form 940) of $3,523.31 plus $233.00 interest owed the United States for the year ending December 31, 1974, and debts substantially in excess of assets. While G. J. Sinclair received only $4,000.20 in salary in 1975, Richard Sinclair took out $17,925.00.

■ A substantial question, raised by the bankruptcy judge's declaration that G. J. Sinclair seeks priority "for a loan he never made," is who advanced the funds, and why is G. J. Sinclair being treated as the preferred creditor. The record shows a $20,000 check from Mid-Kansas Federal Savings and Loan Association to Richard Sinclair, with G. J. Sinclair listed as remitter; the check is deposited to Richard's personal checking account; and a check drawn by Richard on that account is made payable to Mid-Town. As noted previously, the promissory note of Mid-Town to G. J. Sinclair dated February 19, 1975, is signed by Richard as President, a position he did not hold at that time. All stock owned by G. J. Sinclair and his wife was transferred to Richard on June 5, 1975. The date the note was formally executed is unknown precisely, but perhaps was signed after February 19, 1975. The security agreement, dated February 19, 1975, was signed by G. J. Sinclair between August 15 and 18, 1975.

This was shortly before another promissory note was signed dated August 30, 1975, also stated to be secured by accounts receivable, containing no due date, no interest, no specified installment payment dates, but declaring that if any installment was not paid then the whole sum should become due and payable. While it was stipulated in the bankruptcy proceeding this note should be subordinated to all other creditors' claims, inquiry into the basis for its existence and the reasons for its execution would be relevant to determine whether there was a scheme to obtain personal advantage for insiders to the detriment of creditors.

■ We do not think a mere challenge should place a near insurmountable burden of proof upon G. J. Sinclair to justify what was done. But he and Richard Sinclair have the knowledge of the transactions discussed above, and as the insider with the burden of showing the inherent fairness of claim to priority the burden of explanation should be upon G. J. Sinclair. *Pepper v. Litton, supra.*

For the reasons stated we reverse and remand the cause for further proceedings consistent herewith.