**In re 5000 SKELLY CORPORATION, Debtor.**

**FIGGIE ACCEPTANCE CORPORATION, Plaintiff,**

**v.**

**ABATEMENT SYSTEMS, INC., Defendant.**

**Bankruptcy No. 90–02657–C.**

**Adv. No. 91–0332–C.**

United States Bankruptcy Court, N.D. Oklahoma.

June 10, 1992.

Gerald G. Stamper, Tulsa, Okl., for plaintiff.

Gary M. McDonald, Tulsa, Okl., for defendant.

Katherine Vance, Tulsa, Okl., Asst. U.S. Trustee.

MEMORANDUM OPINION

STEPHEN J. COVEY, Chief Judge.

This matter comes before the Court upon a complaint for declaratory judgment which Figgie Acceptance Corporation ("Figgie") filed November 27, 1991, against Abatement Systems, Inc. ("ASI") requesting this Court find Figgie's mortgage against the real estate, owned by 5000 Skelly Corporation ("Debtor"), has priority over ASI's mechanic's lien. ASI responded and contends its lien should be granted priority over the mortgage lien of Figgie under the state law doctrine of equitable estoppel or under the doctrine of equitable subordination as provided for in Section 510(c) of the Bankruptcy Code. This Court has jurisdiction to determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

Procedural History

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on September 12, 1990. The case was converted to relief under Chapter 7 on September 19, 1991. The Debtor's property to which the liens attach is a hotel located at 5000 Skelly Drive, Tulsa, Oklahoma. On October 29, 1991, pursuant to § 363 of the Bankruptcy Code, the Trustee sold the real estate to Figgie for the sum of $4,350,000.00 free and clear of all liens, claims and encumbrances which subsequently attached to the proceeds of the sale.

The issue before the Court is whether ASI's mechanic's lien, filed of record after the recordation of Figgie's mortgage, can be given priority over the mortgage on the basis of equitable estoppel or equitable subordination. If ASI's mechanic's lien can be given priority, then it will be paid in full on its claim of $156,369.00. If ASI's mechanic's lien cannot be given priority, then all the sales proceeds will be paid to Figgie on its claim of $5,100,967.83.[1] In this event, ASI will be relegated to the unsecured class and paid nothing.

Significant Events

On July 7, 1989, the Debtor purchased the real estate in question. In order to finance the purchase, the Debtor, on this date, borrowed $6,500,000.00 from Figgie. $3,500,000.00 was to be used to purchase the property, $1,500,000.00 was for asbestos abatement and $1,500,000.00 for other renovations. The money for the purchase of the hotel was advanced at this time and the Debtor acquired ownership of the property. Under the terms of the note and mortgage the Debtor was to make monthly payments on the note and mortgage commencing August 1, 1989.

Also on July 7, 1989, the Debtor and Figgie entered into a loan agreement whereby Figgie agreed to make periodic advancements for the asbestos removal and other renovations as the work was done. Under this loan agreement, Figgie had complete control of the construction. It approved all contractors, approved all contracts, inspected the work as it progressed, approved all periodic payouts if the work had been done properly, and obtained assignments of all construction contracts between the Debtor and the contractors. The loan agreement also allowed Figgie to declare the loan in default and refuse to make further advances on the asbestos work and other renovations, if Debtor defaulted on its monthly mortgage payments.

The principal players in this saga included the following.

1. Steve Wood ("Wood"), Marketing Representative of Figgie. Wood, who was located in Columbus, Ohio was in charge of the project for Figgie;

2. Neil Block ("Block"), a construction consultant from Houston, Texas, was hired by Wood to be Figgie's on-site construction supervisor. Block was to inspect all the work and if he approved, would recommend to Wood that the progress payments to the contractors be made;

3. Steve Fulps ("Fulps") and John Sumners ("Sumners"), equal owners of ASI;

---

**1.** There is some confusion as to the amount due Figgie on its mortgage. The final amount determined to be due was the amount Figgie bid for the property at the bankruptcy sale of $4,350,000.00. The claim filed by Figgie was in the amount of $5,100,967.83.

4.  William B. Smith ("Smith"), the Debtor's principal;

5.  Kelli Hall ("Hall"), Debtor's project manager. She handled all the scheduling, the draw requests, the order of work to be done, the inspections and the start dates. She was essentially the go-between for Wood, the Debtor and Block on one hand and Fulps and Sumners on the other;

6.  Ron Looney ("Looney"), the Debtor's on-the-job construction manager. Originally, he was to be general contractor, but Wood and Block changed his status to construction manager.

On October 4, 1989, a meeting was held at the hotel to discuss the asbestos removal and renovation. Wood, Block, Smith, Looney and Fulps were present. Many items were discussed, including the following:

1.  The scope of work, whereby Figgie insisted the asbestos be completely removed not encapsulated;

2.  Third party inspection of asbestos work was required by Figgie;

3.  ASI had to provide liability insurance to cover anyone injured in the removal; and

4.  ASI had to provide a performance bond.

During the discussions of the above items, Fulps asked how payment to ASI was to be assured. Fulps wanted a payment bond from Figgie guaranteeing payment to ASI, if the Debtor failed to pay. Both Wood and Block replied that Figgie did not give payment bonds, it was a Fortune 500 company, and if the work was done properly and Block approved, ASI would be paid. Block said ASI should not worry about payment and get started on the job. The parties also discussed a letter from Figgie agreeing to set aside funds from the mortgage for payment to ASI.

On November 27, 1989, Fulps, Sumners, Looney and Block again met at the hotel. In response to Sumners' request for a payment assurance or guarantee, Block advised him ASI would get a set aside or indemnification letter. Paraphrased, Block stated "Figgie will give you an assurance letter, don't worry about it, lets get on with the job, that he would inspect the work, if he approved, he would notify Figgie, and Figgie would pay by a joint check to the Debtor and ASI." Sumners informed him ASI would not start work until an assurance letter was provided, because ASI had no faith in the Debtor's ability to pay. Block indicated such a letter would be forthcoming and would be no problem.

In early January 1990, Sumners and Wood talked on the telephone in regard to ASI's obtaining a performance bond and Figgie's set aside letter. Sumners advised Wood ASI could not obtain a performance bond until the receipt of the letter. Wood again assured Sumners the letter would be forthcoming and if ASI did the work, it would get paid.

On January 9, 1990, ASI and the Debtor entered into two contracts for the removal of the asbestos from the hotel. Figgie approved both of these contracts. The first contract was referred to as the "Base Bid" and was described as Alternates No. 1 and No. 2. This bid was in the amount of $141,730.00. The second contract described as Alternate No. 3 was in the amount of $398,000.00. These two contracts cover different phases of the asbestos removal. Later the first contract was increased to a total of $151,650.00 and the second to $425,860.00. The total amount to be paid for the job was $577,510.00.

After Fulps and Sumners made repeated requests to Hall, Block and Wood for an assurance letter and stated ASI would not start work until one was provided, Wood executed a letter on February 2, 1990, which was mailed to the Debtor and immediately delivered to ASI. This letter was as follows.

February 2, 1990
*AIRBORNE EXPRESS*
Abatement Systems, Inc.
c/o 5000 Skelly Corporation
5727 South Lewis Avenue
Suite 727
Tulsa, Oklahoma 74105
RE: Lender's Set Aside for Asbestos Abatement
Work For Park Plaza Inns Project

Gentlemen:

Please accept this letter as confirmation that Figgie Acceptance Corporation ("FAC") has, under the Loan Agreement between 5000 Skelly Corporation and FAC, dated July 7, 1989, provided for the funding of the following contracts at the stated amounts.

CONTRACT FOR: Base Bid Including Alternative Numbers 1 and 2 — $141,730.00
CHANGE ORDER NO: 01 — $ 9,920.00
Total — $151,650.00

CONTRACT FOR: Alternate #3 — $398,000.00
CHANGE ORDER NO: 01 — $ 27,860.00
Total — $425,860.00

These funds are now available for disbursement in accordance with the Loan Agreement.

We trust this satisfies your requirements.

Sincerely,

Stephen P. Wood

Marketing Representative

cc: 5000 Skelly Corporation

Neil Block—Neil Block Interests

On February 12, 1990, ASI began the asbestos abatement work. This work was completed in July of 1990 to the complete satisfaction of both the Debtor and Figgie. ASI received progress payments during the job and has been paid the entire amount due, except for the sum of $156,369.00. In May of 1990, when ASI had trouble receiving one of its progress payments, Sumners called Wood and again Wood assured Sumners ASI would be paid, if it did the work.

From November 1989 through July 1990, the Debtor was chronically late in its mortgage payments to Figgie. Finally, on July 26, 1990, Figgie declared the loan in default and accelerated the balance due of $5,100,-967.83. After declaring the loan in default, Figgie refused to pay ASI or any of the other contractors for the work performed for asbestos abatement or renovation of the hotel. Wood contended Figgie's only obligation was to set aside funds from the loan if the loan was completely funded. If Figgie was under no obligation to fund the loan, then there was nothing to set aside.

In August of 1990, after ASI had satisfactorily completed all of the asbestos removal, Wood informed ASI that Figgie was not going to pay for the work and the "set aside letter" was not a payment guarantee.

This was the first notification ASI had received from Figgie that it was not going to pay for the work. Additionally, Figgie had never notified ASI its payment was dependent upon the Debtor being current on its mortgage payments or even that the Debtor was chronically late in making these payments.

On September 10, 1990, ASI filed its mechanic's lien against the Debtor's real estate in the amount of $156,369.00.

### Conclusions of Law

The doctrine of equitable estoppel whereby a mechanic's lien can be given priority over a previously recorded real estate mortgage is stated in *Apex Siding & Roofing Co. v. First Federal Savings & Loan Association*, 301 P.2d 352 (Okla.1956). In this case, the owner of property wished to make repairs to the roof. Apex, the roofer, and the owner, contacted First Federal Savings & Loan Association, the holder of the first mortgage on the property, in regard to a loan to pay for the repairs. The bank agreed to make the additional loan and in a letter stated it was holding funds in escrow for the needed repairs, which would be paid out upon completion of the job. This letter was given to Apex and both Apex and the owner contacted the bank in regard to the documents to be executed for the additional advance. Apex then made the repairs, but the bank refused to make the additional loan and foreclosed its mortgage. The Oklahoma Supreme Court, reversing the trial court, found Apex' materialman's lien had priority over the mortgage lien of First Federal Savings & Loan Association. In its opinion, the Oklahoma Supreme Court set forth the following doctrine:

Equitable estoppel is the result of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might have otherwise existed as against a person who, in good

faith, relied on such conduct and has been thereby led to change his position to his detriment, and who has acquired some corresponding right. It holds a person to a representation made, or a position assumed, where otherwise inequitable consequences would result to another, who, having a right to do so under the circumstances, has in good faith, relied thereon.... Apex contacted plaintiff for the specific purpose of determining if the necessary funds would be available to make repairs, and plaintiff's letter to defendant in response to the parties' conference is in positive, affirmative terms. Apex relied on this representation. It would be inequitable for plaintiff to receive the benefit of these substantial repairs and improvements to its mortgage security and yet permit it to assert the priority of its mortgage over Apex' lien which had its inception in the making of said improvements.... The plaintiff is estopped to assert its mortgage priority against Apex to the extent of the funds it represented it would disburse on completion of the repairs....

This doctrine has been cited with approval and followed in the case of *Palmer v. Crews Lumber Co., Inc.*, 510 P.2d 269 (Okla.1973) and cited with approval, but distinguished, in *Liberty Nat. Bank & Trust Co. v. Kaibab Industries*, 591 P.2d 692 (Okla.1978), rehearing denied (1979).

The doctrine of equitable subordination of one claim to another has been recognized by Section 510(c) of the Bankruptcy Code and many decisions construing said section. The section is in part as follows:

... the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim ...

In order for the Bankruptcy Court to invoke this doctrine, the following three elements must be present.

1. The claimant has engaged in inequitable conduct;

2. The conduct has injured creditors or given unfair advantage to the claimant; and,

3. Subordination of the claim is not inconsistent with the Bankruptcy Code. *In re Holywell Corp.*, 913 F.2d 873 (11th Cir. 1990); *In re Universal Farming Industries*, 873 F.2d 1334 (9th Cir.1989); *In re Giorgio*, 862 F.2d 933 (1st Cir.1988); *In re N & D Properties, Inc.*, 799 F.2d 726 (11th Cir.1986); and, *Matter of Missionary Baptist Foundation of America*, 818 F.2d 1135 (5th Cir.1987).

In the present case, Figgie, acting through Wood and Block, on many occasions told ASI, in one form or another, that payments would be made if the work was done properly. Additionally, in response to a demand for a payment bond, guarantee letter or payment assurance letter Wood wrote ASI a letter described as a "set aside letter" for asbestos abatement. This letter stated the funds were available for disbursement and trusted the letter satisfied ASI's requirement. Figgie knew ASI did not want to rely upon the Debtor for payment and was looking to Figgie for a guarantee or assurance of payment. This letter was in response to these concerns and expressly states "[w]e trust this satisfies your requirements." This is a clear indication of Figgie's intent to see ASI was paid, if the work was performed properly. Additionally, Figgie had complete control of the construction job. It had an assignment of all construction contracts, it approved all contractors, approved all contracts, inspected the work, approved work before payment, made work changes and decided the order of work. Finally, Figgie never told ASI, until all the work was done, that it would not get paid, if the Debtor defaulted on its mortgage payments or that Debtor was chronically behind in its payment.

Under these circumstances, it would be unequitable and unfair to allow Figgie, as current owner of the property, to accept the benefits of the asbestos removal and not pay for them as they promised to do on many occasions in one form or another. Under either the state law doctrine of equitable estoppel or equitable subordination

under the Bankruptcy Code, the mortgage claim of Figgie must be subordinated to the mechanic's lien claim of ASI.

This Court will enter a separate judgment consistent with this Memorandum Opinion.