UNITED STATES of America, Plaintiff,

v.

COLORADO INVESCO, INC., Defendant.

Civ. A. No. 93-K-1003.

United States District Court,
D. Colorado.

Oct. 23, 1995.

Mary E. Keane, Office of SBIC Litigation, SBA, Washington, DC, for Plaintiff.

Mark Ebel, Holland & Hart, Denver, Colorado, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This civil action, brought by the United States of America on behalf of its agency, the Small Business Administration ("SBA") acquired exclusive jurisdiction of Colorado Invesco, Inc. ("Invesco"), and all of its assets. On May 13, 1993 I appointed the SBA as receiver of Invesco ("the Receiver"). At that time the court entered a consent judgment in favor of the United States against Invesco for the sum of $588,876.97. On April 24, 1995 Receiver presented a proposed disposition of Invesco's assets. An order authorized payment of any non-disputed claims. Mile Hi Cablevision ("Mile Hi") disputed Receiver's proposed order of disposition asserting its claims were to be satisfied before those of the SBA. The issue before me now concerns which, if any, claims on Invesco's assets are to be paid by the Receiver before it satisfies the claims of the SBA. Jurisdiction exists under the Small Business Investment Act of 1958, as amended 15 U.S.C. §§ 687(d), 687, 687c and 687(h); the Small Business Act, 15 U.S.C. § 634(b)(1); and 28 U.S.C. § 1345.

The SBA, in its capacity as the Receiver, moves to amend its proposed disposition of claims.

## BACKGROUND

Invesco received its license as a small business investment company ("SBIC") from the SBA in 1984. A SBIC is a venture capital company which is licensed and regulated by the SBA. It provides equity capital and long term loans to small business concerns. Under §§ 681(d) and 683(c) of the Small Business Investment Act of 1958, the SBA can fund companies like Invesco by purchasing their preferred stock, thereby infusing cash in the company and becoming a shareholder. The SBA funded Invesco by purchasing $560,000 of non-voting preferred stock from Invesco in 1988. The stock had no voting rights, but the SBA had the right to make a demand on Invesco for redemption.

After Invesco's incorporation, shareholders Mile Hi and the Colorado Housing and Finance Authority ("CHAFA") made advances to Invesco to cover operating expenses. On July 31, 1989 and on December 31, 1990 Mile Hi converted into promissory notes prior advances it had made to Invesco for operating expenses. At a date unclear from the evidence, CHAFA purchased a note originally executed by Invesco in favor of Universal Lending Co. On December 31, 1990 CHAFA converted the outstanding principal and interest of advances it had made to Invesco into a promissory note.

Business went quite poorly for Invesco, and in 1991 the SBA determined the company was 99% capitally impaired. Soon after, SBA made a demand on the Invesco board to repurchase its 56,000 shares of preferred stock. At the time, Invesco's assets were insufficient to meet the demand. Invesco's board presented a self-liquidation plan to the SBA which was promptly rejected. Soon after this, Invesco turned all of its assets over to the SBA for liquidation.[1] The principal shareholders of the common, and therefore voting, stock were Mile Hi and CHAFA, holding 52% and 48% of the shares respectively.[2]

---

1. The rights of SBA to the preferred stock can be found in Exhibit A to Mile Hi's Response to the proposed order. The "Articles of Amendment to the Articles of Incorporation of Colorado Invesco, Inc." effective January 25, 1988, show SBA shall have no vote but be paid dividends. The rights of SBA's preferred stock take precedence over any other preferred stock. In case of any liquidation SBA is paid before any other stockholder except that ordinary dividends from retained earnings may be paid to other shareholders first.

2. It should be noted that Colorado Housing Finance Authority has not to this date made a response in opposition to the Receivers original

On May 10, 1993, the United States filed a complaint against Invesco based on Invesco's failure to repurchase the stock owned by SBA. By Order dated May 13, 1993 this court took exclusive jurisdiction of Invesco and all of its assets wherever located. I appointed the SBA as Receiver for the purpose of liquidating all of Colorado Invesco's assets and satisfying the claims of creditors in the order of priority as determined by this court.

The Receiver's original Proposed Order dated April 10, 1995 ("Order") allowed satisfaction of the interest on the above mentioned promissory notes to be disbursed before satisfaction of SBA's claims. Only after SBA was satisfied could the principal on these notes be paid to the holders. Neither party anticipated any funds would be left to pay these notes if SBA's claims were satisfied first. Consequently, the proposal was disputed by Mile Hi in its response dated May 19, 1995 ("Response").

In the Response, Mile Hi challenged the Receiver's proposed order of disposition. The Receiver based that proposed order of disbursement on an alleged agreement, made during an Invesco Board of Director's meeting held on October 22, 1991, by Mile Hi and CHAFA to subordinate their claims on these notes. Mile Hi disputed the existence of any agreement to subordinate their claims to the SBA. Mile Hi acknowledged that at the Invesco Board of Director's meeting on October 22, 1991 there was mention of a proposal by Mile Hi and CHAFA to subordinate their claims to the SBA. Mile Hi argued, however, that this proposal was part of a proposed self-liquidation plan for Invesco in response to SBA's demand for redemption of its stock. This was then presented to the SBA for approval. Soon after the October 22, 1991 meeting, however, the SBA rejected Invesco's proposed self-liquidation plan.

In light of the above events, Mile Hi argued the proposal to subordinate its claims to the SBA was rejected, or at the very least was withdrawn. Mile Hi argued the claims for repayment of these promissory notes should be governed by the notes themselves and, thus, are not subordinate to SBA's claims for judgment.

In the Receiver's reply to Mile Hi's response in opposition to the Order ("Reply"), dated August 11, 1995, it now presents an entirely different theory for satisfying the claims of the SBA before Mile Hi consequently proposing a new order of disposition for the assets. Receiver now argues not only the principal balances on the promissory notes issued in favor of Mile Hi and CHAFA should be subordinate to SBA's claims, but also the interest accrued on them should be subordinated. The Receiver seeks to amend the Order on the assumption that the notes issued in favor of Mile Hi and CHAFA were actually shareholder capital contributions. It asserts fairness prohibits these shareholders from characterizing the capital advances as loans. The Receiver requests application of principles of equitable subordination to the Mile Hi and CHAFA loans to deem them inferior in priority to its own claims on Invesco's assets.

The Receiver's thesis on this issue is confusing in light of the law of bankruptcy. While some of the issues do overlap, a better way to have framed the argument would have been to assert that the loans are actually capital contributions or in the alternative, if they are deemed loans, the loans should be equitably subordinated to the claims of more deserving shareholders. In the bankruptcy context, if the loans were capital contributions, they do not have to be subordinated because capital contributions are not debt that must be repaid as loans. Therefore, the only way Mile Hi and CHAFA could ever be paid before SBA is if the loans were considered valid. Equitable subordination is used when loans are actual outstanding debt which normally would be paid before shareholders, but are subordinated to other claims because of principles of fairness.

The Receiver argues the advances were characterized as loans only to defeat the interests of Invesco's largest investor, the SBA. It claims there was impropriety on the part of Mile Hi and CHAFA in their dealings with Invesco in relation to these loans. Accordingly, the Receiver asserts Mile Hi and

*recommended disposition of claims and motion* for an order approving these claims.

CHAFA's claims should be equitably subordinated to SBA's.

Mile Hi filed a response in opposition to Receiver's Reply ("Response 2") dated September 1, 1995. In it, Mile Hi argues the Mile Hi loans should not be characterized as debt and that the doctrine of equitable subordination does not apply. Mile Hi contends that it made loans to Invesco for operational expenses. It claims that Invesco always treated the advances as loans, regardless of when they were converted into promissory notes. Mile Hi points out the promissory notes all list a principal loan amount, an interest rate and a payment schedule. It further claims Invesco was started with sufficient capital and had been operating for seven years before the first note was issued. Finally, Mile Hi notes its attempt to subordinate its loans to the SBA as part of a proposed liquidation plan shows Mile Hi considered the advances to be loans and was willing to give up its claims to help Invesco liquidate without going into receivership. Mile Hi claims the doctrine of equitable subordination does not apply in this case.

### Merits

#### A. Characterization of Mile Hi's Loans as Capital Contributions.

In a case such as this, the first determination must be whether the loan transaction was a contribution to capital or a loan. *G.J. Sinclair v. Barr (In re Mid–Town Produce Terminal, Inc.)*, 599 F.2d 389, 393 (10th Cir. 1979). "The ability to recharacterize a purported loan emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance." *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir.1991). Recharacterization of the loans as contributions to capital is suggested when the contributors are not only shareholders but insiders or fiduciaries. *Id.* at 1469.

Relevant factors used by courts to determine if a loan should be recharacterized include the amount of initial operating capi-

tal, the length of time the corporation was in operation and how the transactions were treated when made. *In re Mid Town*, 599 F.2d at 392. The tests devised by the courts are derived from *Pepper v. Litton:*

> [S]o-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder ... where the paid in capital is purely nominal, the capital necessary for the scope and operations of the company being furnished by the stockholder [will be treated] as a loan.

308 U.S. 295, 309, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939). Courts have used and modified this concept from *Pepper* in order to determine whether an advance by an insider is truly a loan or in reality an unsecured contribution to capital.[3]

The key idea from *Pepper* is the theory of undercapitalization. That theory looks either to the initial amount of capital in a corporation or its financial status at the time the loans were made. Courts look to the specific facts of each case to determine if a debtor was undercapitalized. "Necessarily, this inquiry is highly factual and may vary substantially with the industry, company, size of the debt, account methods employed, and like factors." *Machinery Rental, Inc. v. Herpel (Matter of Multiponics, Inc.)*, 622 F.2d 709, 717 (5th Cir.1980). The Fifth Circuit used a two part test for the standard to be applied:

> "(1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;
>
> (2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source."

*Id.* (quoting *In re Mobile Steel Co.*, 563 F.2d 692, 703 (5th Cir.1977)). *See also In re Mid–Town Produce Terminal, Inc.*, 599 F.2d at

---

**3.** *See* Jules S. Cohen, *Shareholder Advances: Capital or Loans*, 52 Am. Bankruptcy L.J. 259, 260 (1978) (copy attached as Exhibit 11 of Receiver's

Reply of August 11, 1995). The author points out the language in *Pepper* was dictum.

392. The Fifth Circuit held the initial issue would be whether reasonably prudent persons in the industry would have loaned money to the debtor business. *Id.*

█ The Receiver claims the loans, when reduced to writing in the form of promissory notes, were made at a time when Invesco was 99% capitally impaired. As evidence of this, the Receiver refers to a letter to Invesco dated April 19, 1991 informing Invesco that it was 99% capitally impaired as of December 31, 1990. (Reply Ex. 6). Invesco acknowledged the impairment and its financial condition in a letter dated May 22, 1991. (Reply Ex. 7).

Neither SBA's letter nor Invesco's reply speaks to the issue of Invesco being capitally impaired when the first two promissory notes were issued in 1989. Further, there is some question even to the capital impairment when the second notes were issued on December 31, 1990. The letter from Invesco dated May 22, 1991 shows Invesco claimed the finding of impairment may not have been justified. In the letter Invesco reasoned that an unaccounted for increase in value of two of its holdings should justify a different finding. Invesco thinks a better financial condition could be supported by documentation that would take some time to gather.

The Receiver also submitted a letter from an independent auditor which confirms a report, made by that auditor, that as of December 31, 1990 the balance sheet of Invesco showed a 99% capital impairment. (Reply Ex. 8). This report states the fears conveyed in SBA's letter dated April 19, 1991, were valid, and that the SBA correctly identified Invesco's financial situation. The auditor's letter and report are strong evidence the two notes issued on December 31, 1990 were made at a time when Invesco was capitally impaired. The report, however, is silent as to the earlier 1989 loan dates. Additionally, the Auditor cautions the valuation of the securities held by Invesco may not be accurate and, "the differences could be material." Therefore, Invesco may have been correct in stating the evaluation was wrong.

Whether another party would have made the loans to Invesco based on its capital is an issue not addressed by either the Receiver or Mile Hi. It is clear on August 15, 1989, however, a promissory note in favor of Universal Lending Corporation was issued for the amount of $25,000. Therefore, at least as to Mile Hi's 1989 note, another was willing to lend money to Invesco at the time of the disputed loans.

█ In a bankruptcy case each claimant has the ultimate burden to prove the validity of its claims. *Anaconda–Ericsson Inc. v. Hessen (Matter of Teltronics Services Inc.)*, 29 B.R. 139, 168 (Bankr.E.D.N.Y.1983). Accordingly, Mile Hi has the burden to prove the loans were in fact valid. It asserts there were valid executed promissory notes in its favor. It claims both notes list a principal loan amount, interest rate and payment schedule. Further, payments were made on both notes. (Mile Hi's Response at 4). Mile Hi also asserts Invesco had sufficient initial operating capital when it was incorporated and the first loan was not made until seven years after Invesco's beginning. Moreover, Mile Hi claims Invesco had always accounted for the transactions as debt. *Id.* at 3.

**B.** *Equitable Subordination of Mile Hi's Claims to Those of the SBA.*

█ If a shareholder loan to a corporation is treated as a capital contribution, the shareholder cannot claim those funds must be repaid like corporate debts in a bankruptcy proceeding. They are neither secured or unsecured loans to the failed corporation. This is not the case where equitable subordination applies. Under the doctrine of equitable subordination, the loans are still considered outstanding debt of the bankrupt entity. In order to remedy some inequity or unfairness done to other parties, however, the subordinated creditor's right to repayment is abated until those other parties are satisfied.

The doctrine of equitable subordination is only used to remedy inequity and unfairness, and those are the key issues for determination. In this case Mile Hi contends because its advances to Invesco were loans, they must be repaid before the shareholders's claims are satisfied. Accordingly, if Mile Hi's advances were capital contributions, I need not

rule on equitable subordination as there would be no claim to subordinate.

■ The doctrine of equitable subordination in the bankruptcy context permits a court to exercise its equitable powers to subordinate the claims of insiders to other shareholders. The court acts where failure to do so would result in unfairness to other claimants in the disbursement of assets. Common law principles of equitable subordination are reflected in the Bankruptcy Code, 11 U.S.C. § 510(c) which permits equitable subordination of all or a portion of a creditor's claims "for purposes of distribution." A party seeking this must demonstrate:

"1. The claimant has engaged in inequitable conduct;

2. The conduct has injured creditors or given unfair advantage to the claimant; and

3. Subordination of the claim is not inconsistent with the Bankruptcy Code."

*In re Castletons, Inc.*, 990 F.2d 551, 559 (10th Cir.1993), (quoting *In re 5000 Skelly Corp.*, 142 B.R. 442, 446 (Bankr.N.D.Okla.1992)).

"The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation or the exercise of such total control over the debtor as to have essentially replaced its decision making capacity."

*Id.* (quoting *In re Clark Pipe & Supply Co.*, 893 F.2d 693 (5th Cir.1990)). " 'The critical inquiry . . . is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated.' " *Id.* (quoting *Long Island Lighting Co. v. Bokum Resources Corp.*, 40 B.R. 274, 296 (Bankr. D.N.M.1983) (citations omitted)).

■ "Because there is incentive and opportunity to take advantage, dominant shareholders and other insiders' loans in a bankruptcy situation are subject to special scrutiny." *In re Mid–Town Produce Terminal, Inc.*, 599 F.2d at 392. It is not enough, however, to show only there was an insider loan; some impropriety must also exist. *Id.* An insider loan is not inherently improper.

*Id.* In an unpublished opinion, the Tenth Circuit held only unfair conduct need be shown if the claimant (the party against whom the equitable subordination is sought) is an insider or a fiduciary of the company at issue in bankruptcy. *Figgie Acceptance Corp. v. City Roofing Co. (In re 5000 Skelly Corp.)*, No. 93–5176, 25 F.3d 1056 (10th Cir. June 1, 1994) (table only) (citing *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 731 (11th Cir.1986).)

■ The burden of proof is important as to the equitable subordination issue. Mile Hi has the ultimate burden to prove the validity of its claim on the loans. Once there is proof the claim itself is valid, i.e. these were loans, however, it is the receiver's burden to present material evidence of unfair conduct. *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 731 (11th Cir.1986). If the Receiver makes a prima facie case for equitable subordination, the burden of going forward shifts to Mile Hi. *In re Mid–Town Produce Terminal, Inc.*, 599 F.2d at 394. Once there is a shift, Mile Hi must show this was an arms length transaction. *See Matter of Fabricators, Inc.*, 926 F.2d at 1465; *In re N & D Properties, Inc.*, 799 F.2d at 731.

■ The status of the claimant whose claims the court is asked to subordinate is important. If Mile Hi is an insider, the Receiver still needs to show impropriety and harm to SBA but to a lesser extent than if Mile Hi were not an insider. *See Figgie Acceptance Corp.*, 25 F.3d at 1056.

The Bankruptcy Code is quite clear that if the debtor is a corporation, any director, officer or person in control is an insider. 11 U.S.C.A. § 101(31)(B) (West 1988). In order for the Receiver to make a prima facie case, it need only show evidence the loans were unfair to other investors of Invesco. However, the case law does not support the idea that the inquiry can stop there. Mile Hi must be shown to have had some culpability. If this were not true, all insider shareholder loans would be unfair because they are paid off before other shareholder claims.

The Receiver offers two main arguments in support of the claim of impropriety. First,

it argues the nature of the notes themselves supports a finding of wrongdoing. The Receiver claims the loans (if they were loans) were repaid sporadically, were made by insiders, were at below market rates, and were not arms length transactions. Second, it claims Mile Hi's insider status and knowledge of Invesco's financial difficulty show self-dealing and thus the impropriety necessary to support equitable subordination.

There is no evidence presented reflecting how earnestly these loans were repaid while Invesco was solvent. Mile Hi asserts payments were made. There was outstanding interest owed on the notes, however, at the time the Receiver was appointed. This may point to a failure (and allowance of this failure) to repay the loans or service the interest. The Receiver also claims the loan terms allowed Invesco to wait eighteen months before it needed to begin repayment. No evidence, however, has been presented showing this term of repayment is uncommon for loans of this type.

The Receiver asserts the interest rates on the Mile Hi loans were comparatively low, thus demonstrating inequitable self-dealing. It has presented "Wall Street Low Prime Rates" for a range of years including the years of the promissory notes in question ("the Chart"). (Reply Ex. 10). Assuming these rates are correct, the promissory notes were not issued at the current prime rates. All the notes originally made by Mile Hi or CHAFA had an initial rate of 8% rising to as much as 10%. The chart shows the rates were at 11% in 1989 and 10% in 1990. It is not clear from the evidence, however, whether these rates were the industry standard for the types of loans made to Invesco.[4]

The evidence, even on its face, is not proof that the Mile Hi loans were made at abnormal rates. The promissory note issued in favor of Universal Lending Corporation had an initial rate of 7% rising to as much as 11%. (Reply Ex. 4).[5] The chart indicates the rate for August 1989, the time of the loan, was at 10.5%. (Reply Ex. 10). The evidence shows Universal Lending Corporation is an unrelated third party with no insider ties or fiduciary duties to Invesco. The Receiver's argument concerning low interest rates and special treatment for insiders therefore lacks merit.

The Receiver also claims Mile Hi's loans were self-dealing because of Mile Hi's knowledge of Invesco's capital impairment. As to the December 1990 conversion of "loans" into notes executed in favor of Mile Hi and CHAFA, there was evidence Invesco was in severe financial difficulty. As discussed above, the Receiver has submitted letters sent to Invesco informing it of the financial difficulties as of December 31, 1990. The Receiver also submitted a letter from an independent auditor confirming an apparently poor financial situation for Invesco at the time the loans were made. These letters do not, however, show Mile Hi and CHAFA actually knew of the difficulties when they made the December 31, 1990 loans. Even if it can be inferred they knew of the difficulties, the correspondence indicates Invesco (and therefore Mile Hi and CHAFA) did not consider the situation to be so dire. The Receiver has presented no evidence concerning Mile Hi's understanding of Invesco's financial situation at the time the loans were made. The only evidence presented is a look in hindsight, not persuasive evidence of knowledge or culpability.

Even if the misconduct of Mile Hi need only amount to unfair dealing, there needs to be some culpability if a case for equitable subordination is to be made. In its reply to the SBA letter informing Invesco of the capital impairment, Invesco related on the one hand it understood the situation which concerned the SBA, but on the other hand the situation was not irreversible. Moreover, Invesco felt that by May 22, 1991, the date of its reply, the increase in value to some of its holdings had corrected the capital impair-

---

4. In its Response, Mile Hi asserts the submarket interest rate is not proof, as Receiver claims, of insider trading. Rather, it claims, it shows a benefit to Invesco because it was a good deal. This argument, however, is equivocal: Mile Hi claims the advances were loans. If the rates were too low, no entity would make the advance unless it was for another motive such as securing debt in case of impending bankruptcy.

5. This was the note later purchased by CHAFA.

ment. (*See* Reply Ex. 7). This is not a statement that proves Mile Hi knew it was dealing unfairly with Invesco's shareholders.

Mile Hi may honestly not have realized the extent of Invesco's financial situation until the SBA sent its letter. Further, the independent auditor's report merely confirms the SBA's finding there was capital impairment of Invesco, not what the parties knew or believed before the letter. Most importantly, the Receiver claims all the loans were improper, yet two of the promissory notes were made in 1989, more than a year and a half before the date on which the evidence reflects Invesco was capitally impaired.

Even if Mile Hi and CHAFA knew of the impairment, on the reasoning applied in *Mid–Town*, they would not necessarily be condemned for making a secured loan while also being insiders. *In re Mid–Town*, 599 F.2d at 390. In *Mid–Town* a secured loan was made to Mid–Town and a security agreement was executed in favor of an insider. *Id.* At the time, Mid–Town was in serious financial difficulty. *Id.* The court was unwilling to find that a dominant shareholder could not loan money to the corporation and become a secured creditor. *Id.* at 392. The *Mid–Town* court did not want to "discourage owners from trying to salvage a business, and require all contributions to be made in the form of equity capital." *Id.* In light of this, Mile Hi and CHAFA must have done something more than just make the loans to Invesco as insiders. For the doctrine of equitable subordination to be applicable there needs to have been some unfair dealings.

The determinative issue as to the loans in *Mid–Town* as in the present case, is whether there was, "any fraud or sharp dealing requiring subordination under the 'inherent fairness' doctrine." *Id.* at 394. The *Mid–Town* Court looked at the reliance of, and prejudice to, other creditors to determine the fairness of the loans.

In this case it is evident from the Articles of Incorporation of Invesco and the Bankruptcy Code that Mile Hi and CHAFA would be in a better position than the SBA in bankruptcy if their contributions were characterized as secured loans. They would be paid off first as creditors before the SBA and other shareholders. The Receiver, however, has presented insufficient evidence to prove any intentional inequitable conduct. The Receiver does not make a prima facie case of inequity merely by claiming impropriety. In order to shift the burden of going forward to Mile Hi, the Receiver must show evidence of culpability.

As other proof Mile Hi was self-dealing when it did not seek SBA approval of the loans, the Receiver cites the definition of conflicts of interest in the SBA's own regulations for small businesses. The Code of Federal Regulations defines conflicts of interest as, "[s]elf-dealing to the prejudice of the Small Concern, or of a Corporate Licensee or its shareholders, or in the case of an Unincorporated Licensee, the partnership or its members, or of SBA, is prohibited." 13 C.F.R. § 107.903(a). The Receiver claims, *ipse dixit*, this language proves Mile Hi's actions were in fact a conflict of interest tantamount to the self-dealing required by the courts to trigger equitable subordination. The Receiver assumes that not getting SBA approval for a loan is self-dealing. Any shareholder loan is self-dealing because it is a loan from an insider. The Receiver, however, submits no evidence concerning the issue of whether Mile Hi purposefully acted in such a way in order to prejudice the SBA.

Evidence only that Mile Hi's decision to make contributions in the form of loans later allowed Mile Hi to be paid off before the SBA is not enough to show culpability. If this were enough, any insider loan would be subordinated because it would always be paid off before the shareholder's claims. The law does not favor this tautology.

Mile Hi responds to Receiver's contentions by stating simply there was no conflict of interest. Mile Hi asserts the funds were advanced to Invesco when Invesco was having operational difficulties in 1988. (Response 2 at 7). Mile Hi claims it made efforts to benefit all of Invesco's shareholders, including the SBA. *Id.* Mile Hi explains the loans were made in order to permit the new management of Invesco to determine the value of Invesco's assets. Mile Hi

claims the loans were made to make Invesco stronger so it would not, as it eventually did, go into receivership. Mile Hi admits Invesco may have actually lacked working capital when some of the loans were converted into a promissory note in 1990. It asserts, however, no conflict of interest arose at the time the loans were made, nor did the SBA ever question these transactions. Mile Hi points out the SBA as shareholder or receiver first challenged the loans only in its last motion dated August 11, 1995.

### Conclusion

Mile Hi has presented evidence the transactions at issue here were in fact valid loans. They both were converted into signed promissory notes. The interest rates were not shown to be out of the ordinary. Payments were made on the notes, although how consistently is not reflected by the evidence. Neither party disputes Invesco had sufficient operating capital when it was formed. The loans were made long after Invesco's formation and in order to help Invesco. There was no evidence showing Invesco had any grave financial problems in 1989 when the first loan was made. The Tenth Circuit has ruled that insider loans should not be discouraged. The court said it would be bad policy to stop someone from saving his business. Just because these are valid loans, however, does not mean Mile Hi's claims should not be subordinated to the SBA's.

The Receiver must show that somehow Mile Hi's actions were unfair to other investors of Invesco. If the prima facie case had been made, Mile Hi would have the burden of going forward to prove the loans were fair and made in an arms-length transaction. Solely claiming the SBA may not recover if the loans are paid off before its own claims is not enough to cause equitable subordination. There must be some purposeful inequity shown. None has.

The motion to amend the recommended disposition of assets is denied. The proposed order of disposition is likewise rejected.