**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 26 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

In re: HEDGED-INVESTMENTS
ASSOCIATES, INC.; HEDGED-
SECURITIES ASSOCIATES, LP;
HEDGED-INVESTMENTS
ASSOCIATES, LP; HEDGED-
INVESTMENTS ASSOCIATES II,
LP,

     Debtors,

HARVEY SENDER, Trustee,

     Plaintiff - Appellee,

v.

THE BRONZE GROUP, LTD.,

     Defendant - Appellee,

v.

J. DANIEL BRINKER, DONALD
SHWAYDER, ALFRED WEISNER
and LAURENCE DEMUTH, JR.,
individually and as Class
Representatives of Class III;
CLASS III,

     Defendants - Appellants,

and

FRED HANNAHS and MARY
ESTILL BUCHANAN, individually

No. 02-1191, 02-1192

and as Class Representatives of
Classes I and II; CLASSES I and II,

Defendants - Appellants.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. Civil Action No. 98-B-1507)**

---

Bruce E. Rohde, Davis & Ceriani, P.C., Denver, Colorado (M. Frances Cetrulo and Edwin G. Perlmutter, Berenbaum, Weinshienk & Eason, P.C., Denver, Colorado, with him on the briefs), for Appellants.

Phillip D. Barber, Phillip D. Barber, P.C., Denver, Colorado (Randall J. Feuerstein, Dufford & Brown, P.C., Denver, Colorado), for Appellees.

---

Before **EBEL, BALDOCK** and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This case is the latest to arise from the bankruptcy of Hedged Investments Associates, Inc. (HIA), a stock investment Ponzi scheme which was run for thirteen years by James Donahue until it finally collapsed in the fall of 1990. This long-running dispute again before us concerns the proper distribution of the assets in the bankruptcy estate.

In this appeal, certain equity investors in HIA and its affiliated entities (Appellants) ask us to reverse the district court's decision refusing to

- 2 -

recharacterize as an equity investment a loan advanced to HIA by Defendant-Appellee The Bronze Group, Ltd. (Bronze Group). Appellants also ask us to reverse the district court and equitably subordinate the Bronze Group's claim on the assets of HIA's bankruptcy estate so that the Bronze Group would be treated on par with the Appellant equity investors. We exercise jurisdiction to review the district court's order under 28 U.S.C. § 158(d) and AFFIRM, holding that the Bronze Group loan does not meet either our criteria for recharacterization or for equitable subordination.

## I. Background

Plaintiff Harvey Sender serves as the bankruptcy trustee for HIA. The individually named Defendants-Appellants were investors and limited partners in the various HIA sub-partnerships of Donahue's Ponzi scheme, and they represent three Classes of similarly situated investors who also joined as limited partners of HIA's affiliated partnerships. Classes I and II include HIA limited partners who were forced in prior litigation to return preferential and fraudulent transfers and partnership distributions they had previously received from HIA, totaling $6.7 million, back to the bankruptcy estate. Class III includes HIA limited partners who lost money on their investment, withdrawing less than they contributed to the partnerships. Their claims total $193.3 million. Defendant/Appellee The Bronze

- 3 -

Group, Ltd. is a limited partnership, constituted by several private corporations' pension trusts, that advanced funds to HIA under a loan agreement concluded in June of 1986.

The Bronze Group's initial advance was for $900,000, and with subsequent repayments and new advances the total outstanding principal on its loans to HIA comes to $1.83 million. HIA faces claims from trade creditors for $18,000 and other loan claims similar to that of the Bronze Group's claim for approximately $1 million. The HIA bankruptcy estate has assets of approximately $11 million to divide among HIA's creditors and limited partners.

The Bronze Group's loan agreement with HIA was memorialized in a promissory note and accompanied by a security agreement and UCC-1 financing statements identifying the assets in one of HIA's trading accounts at Kidder Peabody as collateral. The agreement set a flexible interest rate, with a minimum rate of 15% per annum for the life of the loan, plus additional interest to match the rate of any greater HIA earnings, minus a fee of 4% per annum.

In this, the Bronze Group loan's payment terms were nearly identical to the profit payments Donahue had promised to HIA's limited partners/equity investors in the mid-80's. Under the limited partnership agreements, Donahue sent letters to the limited partners setting a guaranteed minimum return for the coming year, with additional profits distributed from HIA's overall gains minus a management

fee that calculated out to approximately 4%. The minimum return promised to limited partners fluctuated over the course of HIA's existence from 8% to 12% to 15%, and in the mid-1980's the promised return was at 15%.

The Bronze Group loan transaction had some peculiar origins. Prior to the formation of the Bronze Group, a substantially similar group of individuals and trust funds had formed a partnership called BGL Associates (BGL), which had contracted with Broker Services, an asset-trading company managed by Mr. Donahue, to set up a stock trading account separate from the HIA partnerships. BGL never became a limited partner of HIA. Upon discovering that Mr. Donahue had not segregated BGL's funds but had commingled them with the pooled HIA accounts, the BGL partners cancelled their arrangement with Broker Services and asked to withdraw their funds totaling $900,000. The members of the now-dissolved BGL partnership then formed the Bronze Group and contributed $900,000, which was then loaned back to HIA under the Bronze Group promissory note.

Mr. Donahue's final disbursement of BGL funds took place on the same day as the contribution of the former BGL partners into Bronze Group and the Bronze Group's advance of $900,000 to HIA under the HIA-Bronze Group loan agreement. At the time of the three transactions, the bank account against which Mr. Donahue's checks to the BGL partners had been written contained $124,000

— far less than the $900,000 paid out to BGL's partners. Those checks did not bounce, however, since the former BGL partners simultaneously deposited $900,000 with the newly-formed Bronze Group, which in turn wrote a check for $900,000 to HIA as the initial advance on the Bronze Group loan. The bankruptcy court below aptly characterized this transaction as a "financial somersault."

During the next four years, HIA sent the Bronze Group 1099 tax forms detailing interest earned on the loan principal, and the Bronze Group asked HIA to fill out "audit letters" that certified to the Bronze Group's auditors that HIA owed the Bronze Group principal and interest on the funds it had borrowed. The Bronze Group made occasional withdrawals from the loan account, which were characterized as HIA's repayment of loan principal and accrued interest, and the Bronze Group also made periodic advances to HIA under the 1986 agreement.

The current case began when Mr. Sender filed for declaratory judgment in the bankruptcy court for the District of Colorado, requesting that the court approve the distribution of the bankruptcy estate to all of HIA's creditors and investors under a "cash-in, cash-out" system, in which each claimant or interest holder would receive a pro-rata share of the estate based upon the principal he or she had loaned or entrusted to HIA. The Bronze Group objected, asserting that its status as a lender to HIA gave it priority over the equity investors and demanding

full payment of the principal and interest due under its loan agreement with HIA. The bankruptcy court held that the Bronze Group's advances to HIA did, in fact, constitute a loan, but the court equitably subordinated the Bronze Group's claim to equal priority with HIA's limited partners/equity investors, and ordered that the HIA estate be distributed on a pro-rata "cash-in, cash-out" basis.

The Bronze Group appealed the equitable subordination order to the district court, and the limited partner Classes cross-appealed the bankruptcy court's decision not to recharacterize the Bronze Group transaction as an equity investment rather than a loan. The District of Colorado affirmed the lower court's decision not to recharacterize the Bronze Group loan but reversed the bankruptcy court's equitable subordination order, entering a judgment in favor of the Bronze Group for the loan principal as well as all interest that accrued prior to HIA's filing for bankruptcy.

The limited partner Classes now appeal the district court's order. They first request that we reverse both lower courts' refusal to recharacterize the Bronze Group loan as an equity investment. They also urge us to reverse the district court on equitable subordination, thereby re-instating the bankruptcy court's order that the Bronze Group's claim be equitably subordinated to equal priority with the interests of HIA's limited partners and satisfied on the same "cash-in, cash-out" basis.

## II.    Recharacterization

*A. Distinguishing Recharacterization from Equitable Subordination*

We begin our analysis by reiterating the important distinction between the two remedies of recharacterization and equitable subordination.

When a putative loan to a corporation is recharacterized, the courts effectively ignore the label attached to the transaction at issue and instead recognize its true substance. The funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as corporate debt, but are instead treated as a capital contribution.

The doctrine of equitable subordination, by contrast, looks not to the substance of the transaction but to the behavior of the parties involved. The funds in question are still considered outstanding corporate debt, but the courts seek to remedy some inequity or unfairness perpetrated against the bankrupt entity's other creditors or investors by postponing the subordinated creditor's right to repayment until others' claims have been satisfied. See Sinclair v. Barr (*In re* Mid-Town Produce Terminal, Inc.), 599 F.2d 389, 393-94 (10th Cir. 1979) (describing the discrete analytical steps as "first determin[ing] whether the transaction was a contribution to capital rather than a loan" and "next ... whether

there was any fraud or sharp dealing requiring subordination under the 'inherent fairness' doctrine").

The Sixth Circuit drew a clear distinction between these remedies in Beyer Corp. v. MascoTech, Inc. (*In re* AutoStyle Plastics, Inc.):

> Not only do recharacterization and equitable subordination serve different *functions*, but the *extent to which a claim is subordinated* under each process may be different.... Recharacterization cases turn on whether a debt actually exists, not on whether the claim should be equitably subordinated. In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the *effect* is subordination of the claim as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation. In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the *remedy* is subordination of the creditor's claim to that of another creditor *only to the extent necessary* to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective.

269 F.3d 726, 748-49 (6th Cir. 2001) (emphasis in original) (internal quotations and citations omitted). Our first task, therefore, is to examine the nature of the Bronze Group's advances to HIA to consider whether they can properly be considered "loans."

*B. Standard of Review*

Whether a transaction labeled as a loan should be recharacterized as an equity investment is a mixed question of fact and law. We defer to the bankruptcy court's findings regarding the fundamental facts of the transaction,

- 9 -

reviewing them under a clearly erroneous standard. Phillips v. White (*In re* White), 25 F.3d 931, 933 (10th Cir. 1994). The application of our legal test for recharacterization to those underlying facts, however, is a question of law which we review *de novo*. Gullickson v. Brown (*In re* Brown), 108 F.3d 1290, 1292 (10th Cir. 1997).

*C. Governing Legal Standard for Recharacterization*

The legal test for recharacterization in this Circuit was laid out in broad terms in *In re* Mid-Town. In that case we reviewed the Utah district court's decision to equitably subordinate a loan made to a family-owned produce store by its dominant shareholder and president, on the grounds that the loan was made by an "insider" at a time when the borrower corporation was badly undercapitalized. Were the courts to permit such a loan from dominant shareholders, the district court feared, controlling equity owners of a troubled corporation could jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights. *In re* Mid-Town, 599 F.2d at 391-92.

This court reversed, rejecting the district court's automatic subordination of insider loans on the grounds that such a fixed rule would discourage owners' efforts to salvage a troubled business. Id. at 392. We then remanded the case, instructing the lower courts to analyze the recharacterization issue separately from

the equitable subordination question, and to do so by looking at three factors: (1) the initial operating capital of Mid-Town, (2) the length of time the business was in operation at the time of the loan, and (3) whether the parties treated the transaction as a loan or as a capital investment. Id. at 393.

Recent tax law cases in other circuits have used a more extensive set of criteria to judge whether funds advanced to a now-bankrupt entity were true loans or camouflaged equity investments. However, these expanded criteria are fully consistent with our more generally phrased test in Mid-Town, and the tax cases seek to vindicate government interests similar to the interests of competing creditors and investors in the bankruptcy context. The Sixth Circuit recently applied such a multi-factor test from the tax cases to a bankruptcy recharacterization inquiry like the one now before us. In re AutoStyle Plastics, 269 F.3d at 750. We now do the same, and while not exclusive, we consider the following factors to distinguish true debt from camouflaged equity:

> (1) the names given to the certificates evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date;
> (3) the source of payments;
> (4) the right to enforce payment of principal and interest;
> (5) participation in management flowing as a result;
> (6) the status of the contribution in relation to regular corporate creditors;
> (7) the intent of the parties;
> (8) "thin" or adequate capitalization;
> (9) identity of interest between the creditor and stockholder;
> (10) source of interest payments;
> (11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.

Stinnett's Pontiac Serv., Inc. v. Comm'r of Internal Revenue, 730 F.2d 634, 638 (11th Cir. 1984).[1]  None of these factors is dispositive and their significance may vary depending upon circumstances.  But it is useful to begin with a fairly detailed list to aid in our analysis.

*D. Application of the Recharacterization Standard*

While the lower courts' discussions of recharacterization failed to identify the standard they applied in reaching their decisions, the bankruptcy court's findings of fact are sufficiently detailed to allow us to apply the test set forth above and to affirm the bankruptcy court's conclusion that the Bronze Group's funds are properly treated as a loan.  Six factors cut in favor of viewing the Bronze Group transaction as a loan: (1) the transaction documents drafted by the

_____

[1]Use of a more comprehensive set of criteria also serves one of our main concerns identified in Mid-Town—that excessive suspicion about loans made by owners and insiders of struggling enterprises would discourage legitimate efforts to keep a flagging business afloat.  Mid-Town, 599 F.2d at 392.  Too heavy an emphasis on undercapitalization produces just such an unhealthy deterrent effect.  Undercapitalization certainly remains an important factor to consider, but under the multi-factor approach we adopt today business owners need not fear, should their rescue efforts fail, that the bankruptcy court would give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.

parties treat the funds as a loan and fulfill the proper formalities for a commercial loan; (2) Bronze Group had the right to enforce payment of principal and interest; (3) Bronze Group acquired no management control in exchange for its funds; (4) Bronze Group's loan agreement did not subordinate it to HIA's other commercial creditors;[2] (5) the parties intended the transaction to be a loan; and (6) HIA was able to secure loans from other lenders around the time, and in one case *after*, it signed for the Bronze Group loan.

Factors weighing in favor of recharacterization include (1) the absence of a fixed loan maturity date, (2) HIA's "thin" capitalization, and (3) HIA's payment of Bronze Group's interest out of a pooled investment account. On balance, we agree with the lower courts that the Bronze Group loan to HIA did not merit recharacterization, and we AFFIRM the district court's judgment on that ground.[3]

---

[2]In contrast, the limited partnership agreements signed by equity investors such as the Appellants explicitly subordinate the investors' interests to the claims of HIA's creditors.

[3]Appellants also cite to four prior rulings from this court, in which we refused to enforce the limited partnership agreements between HIA and its individual investors, and argue that the Bronze Group's loan agreement with HIA should be similarly unenforceable.

In three of the cases referenced by Appellants, the partnership agreements had been invoked by Mr. Sender, acting as HIA's bankruptcy trustee, seeking to recover monies paid out to early investors in Mr. Donahue's ponzi scheme who were fortunate enough to have received "profits" from their venture. See Sender v. Simon, 84 F.3d 1299 (10th Cir. 1996); Sender v. Hannahs (*In re* Hedged-Investments Assocs., Inc.), 86 F.3d 1166 (10th Cir. May 23, 1996) (unpublished); Sender v. Buchanan (*In re* Hedged-Investments Assocs., Inc.), 84 F.3d 1281 (10th

(continued...)

## III. Equitable Subordination

*A. Standard of Review*

Equitable subordination, like recharacterization, presents a mixed question of fact and law. As with our recharacterization analysis above, we review the bankruptcy court's findings of fact for clear error and review the lower courts' application of the legal test for equitable subordination *de novo*.

---

[3](...continued)
Cir. 1996). We refused to permit Mr. Sender to invoke the partnership agreements against the individual investors, stating that we would not "aid the effort of a fraudulent entity that used the trappings of legal formality to lure its victims to turn around and try to hold its victims accountable under those same legal formalities." Sender v. Simon, 84 F.3d at 1308. These cases do not address the situation now before us, in which a creditor of HIA seeks to enforce its claim against the bankruptcy estate.

In the fourth case, Sender v. Buchanan (*In re* Hedged-Investments Assoc., Inc.), 84 F.3d 1286 (10th Cir. 1996) (hereafter, Buchanan II), an individual investor in HIA sought to invoke her partnership agreement with HIA to defend against Mr. Sender's claims for recovery under the fraudulent transfer provision of the bankruptcy statute, 11 U.S.C. § 548. We rejected this defense on public policy grounds, since the defendant investor's ill-gotten profits came directly from the pockets of the ponzi scheme's less "fortunate" victims, and allowing her to retain those funds would penalize others who belonged to the same class of equity investors as did the defendant. Id. at 1290.

Appellants have advanced no argument for extending this public policy principle to apply across different classes of bankruptcy claimants, and we decline to do so. The bankruptcy statutes give clear priority to a bankrupt entity's creditors over its equity investors, and, having refused to recharacterize the Bronze Group's loan as an equity investment, we will not now circumvent the statutory priority scheme by holding the Bronze Group's loan agreement unenforceable.

*B. Governing Standard for Equitable Subordination*

Equitable subordination in bankruptcy is governed by § 510(c) of the Bankruptcy Code, but the statute is phrased broadly:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may –
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

In United States v. Noland, the Supreme Court held that Congress's failure to include specific criteria for equitable subordination in the language of the statute, and the provision's reference to "principles of equitable subordination," "clearly indicates congressional intent at least to start with existing doctrine" that had developed prior to the statute's revision in 1978. 517 U.S. 535, 539 (1996). In a case decided in 1977, the Fifth Circuit announced what has now become the standard formulation of the common law of equitable subordination. Benjamin v. Diamond (*In re* Mobile Steel), recognized by the Noland Court as the leading Circuit case on the subject, listed three requirements that must be met for a court to exercise its equitable subordination power: (1) "inequitable conduct" on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's

- 15 -

conduct; and (3) consistency with the provisions of the Bankruptcy Code. 563 F.2d 692, 699-700 (5th Cir. 1977).

Our Circuit adopted the Mobile Steel standard in Sloan v. Zions First Nat'l Bank (*In re* Castletons, Inc.), placing special emphasis on the inequitable conduct prong: "*The critical inquiry* is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." 990 F.2d 551, 559 (10th Cir. 1993) (emphasis added) (internal quotation marks omitted).

1. The Necessity of the Inequitable Conduct Element

Notwithstanding our statement in *In re* Castletons that identifying inequitable conduct is "[t]he critical inquiry" in equitable subordination cases, Appellants' argue that inequitable conduct is not always a prerequisite for ordering equitable subordination. It is true that this general rule is not without exceptions. In United States v. Reorganized CF&I Fabricators of Utah (*In re* CF&I Fabricators of Utah, Inc.), we held that "section 510(c)(1) does not require a finding of claimant misconduct to subordinate nonpecuniary loss tax penalty claims." 53 F.3d 1155, 1159 (10th Cir. 1995). However, as the district court correctly pointed out below, this is a narrow exception that has been applied solely to tax penalty claims brought by the government, on the theory that giving priority in bankruptcy to punitive fines owed to the government does not serve the

purpose of the punitive fine—which is to punish the company and its owners for their wrongdoing—but rather unfairly punishes the debtor's innocent creditors. We have never extended the exception to the general bankruptcy context.

The Supreme Court subsequently narrowed the exception further when it vacated this court's decision on appeal. See United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213 (1996). A unanimous Court found our holding — that the "no-fault" exception was at least potentially available for all tax penalty claims — was too much like a "categorical reordering of priorities" that the Court had previously found unacceptable in Noland. Id. at 229. The Supreme Court did not, however, prohibit the lower courts from approving an equitable subordination judgment on a case-by-case basis in the absence of any evidence of inequitable conduct.

We decline to extend the "no-fault" equitable subordination exception applied in CF&I Fabricators beyond the tax penalty context. Appellants have presented no persuasive argument that would justify such an extension, nor have they presented any argument that would support granting the severe remedy they seek in the absence of any finding that the Bronze Group acted inequitably. We adhere to the general rule, therefore, that equitable subordination is not justified absent a finding that the party sought to be subordinated engaged in inequitable conduct.

2. The Test for Inequitable Conduct

"Inequitable conduct" for subordination purposes encompasses three categories of misconduct: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." Fabricators, Inc. v. Technical Fabricators, Inc. (*In re* Fabricators), 926 F.2d 1458, 1467 (5th Cir. 1991) (interpreting the Mobile Steel standard and finding the claimant had committed fraud amounting to inequitable conduct by inducing other creditors to continue extending new credit to the troubled debtor company). See also CTS Truss, Inc. v. FDIC (*In re* CTS Truss, Inc.), 868 F.2d 146, 148-49 (5th Cir. 1989) (formulating the categories as cases "in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds other creditors").

When examining a transaction for evidence of inequitable conduct, this Circuit has joined other Courts of Appeals in applying different levels of scrutiny to "insiders" and "non-insiders" of the debtor corporation. See *In re* Castletons, 990 F.2d at 559. Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider. See Estes v. N & D Properties, Inc. (*In re* N & D Properties, Inc.), 799 F.2d 726, 731 (11th Cir. 1986); United States v. Colorado

Invesco, Inc., 902 F. Supp. 1339, 1344 (D. Colo. 1995).  If the claimant is not an insider or a fiduciary, however, the party seeking subordination must "demonstrate even more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation." In re Castletons, 990 F.2d at 559 (internal quotations omitted).

The bankruptcy court did not explicitly discuss whether or not the Bronze Group should be considered an insider of HIA.  Related facts found by the bankruptcy court as well as other evidence in the record strongly suggest the Bronze Group was not an insider of HIA.  Nevertheless, regardless of which standard is used, we conclude that Bronze Group's actions do not constitute "inequitable conduct" applicable to either insiders or non-insiders.

## C. Application of the Equitable Subordination Standard

Appellants have not shown the Bronze Group engaged in inequitable conduct as defined above, and we therefore conclude that the Bronze Group loan may not be equitably subordinated.

The Bronze Group's conduct mentioned in the bankruptcy court's Order and detailed in the record before us does not qualify as "gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation." See id.  The bankruptcy court rested its equitable subordination ruling primarily on the Bronze

Group's failure to conduct reasonable due diligence before advancing the loan to HIA and on the similarities between the Bronze Group loan's earnings structure and the promised returns for the limited partnerships. Failure to conduct due diligence was certainly bad business practice, and the loan's terms might indeed be questionable, but these facts do not amount to blatant fraud or other illegality at the expense of HIA's other creditors.[4] While HIA was most assuredly "undercapitalized" at the time of the Bronze Group loan, mere undercapitalization also falls short of the "gross misconduct" standard, especially where, as the bankruptcy court concluded, the Bronze Group's managers were unaware of HIA's financial straits until the entire scheme collapsed in 1990. There are, moreover, no allegations that the Bronze Group controlled HIA as an instrumentality or an alter ego.

Even if we were to consider the Bronze Group an insider of HIA, Appellants have not shown Bronze Group engaged in sufficiently culpable conduct to qualify for equitable subordination. In order to make a *prima facie* showing of inequitable conduct, Appellants must "present material evidence of

---

[4]Cf. Carter-Waters Oklahoma, Inc. v. Bank One Trust Co., N.A. (*In re Eufaula Industrial Authority*), 266 B.R. 483, 490-91 (B.A.P. 10th Cir. 2001) (finding no gross misconduct and refusing equitable subordination where a bank that served as the indenture trustee for bonds issued to fund a construction project failed to inform contractors of the financial difficulties faced by the project, thus allowing the work to continue in spite of the risk that the contractors would not receive full payment).

unfair conduct," and demonstrate some culpability on Bronze Group's part.  See

*In re* N & D Properties, 799 F.2d at 731; *In re* Eufaula, 266 B.R. at 489; Invesco,

902 F. Supp. at 1345.

As the Seventh Circuit concluded while analyzing the hazards of insider

loans to undercapitalized debtors, "while undercapitalization may indicate

inequitable conduct, undercapitalization is not in itself inequitable conduct." *In*

*re* Lifschultz Fast Freight, 132 F.3d 339, 345 (7th Cir. 1997).  The Lifschultz

court reasoned that low capital resources increases the risk of loss for a lender or

investor, but in a transparent market with good information flows, prices (and

interest rates) will fluctuate accordingly, putting the lender or investor on notice

about his risk.  "Trickery upsets this logic," however, and so an insider lender's

exploitation of secret information or misrepresentation of the borrower's financial

health is punishable by equitable subordination. Id. at 346.

In the case at bar, Appellants do not claim that the Bronze Group extended

a loan with the intention of deceiving or harming the limited partnership investors

in HIA.  It is certainly true that the interest terms on the Bronze Group loan are

similar to the returns promised annually to HIA's equity investors.  Since loans do

not generally pay as well as equity investments, Appellants can argue that the

Bronze Group loan deal does not seem "fair."  But the Appellants themselves

seem to negate any inference of the Bronze Group's "culpability" by offering a

legitimate explanation for Appellee's preference for structuring the funds given to HIA as a loan: the Bronze Group trustees, Appellants observe, desired a loan in order better to comply with their prudent fund management obligations under ERISA. Lending money to a hedge fund may not be exactly prudent, but there is no evidence in the record that suggests the Bronze Group's trustees had any culpable knowledge about the fraudulent nature of HIA or that the trustees had reason to believe the Bronze Group's loan would harm HIA's limited partners. The record shows, and the bankruptcy court concluded, quite the opposite. In any event, there is nothing inherently inequitable about negotiating a creditor relationship with a debtor as a condition of providing funds to the debtor.

Because we hold that a finding of inequitable conduct is a necessary prerequisite to ordering equitable subordination, and because we conclude the Bronze Group's actions do not meet our definition of inequitable conduct,[5] we AFFIRM the district court's judgment that Appellants were not entitled to have

---

[5]Appellants urge us to remand to the bankruptcy court for an explicit statement of whether the Bronze Group was guilty of inequitable conduct. The bankruptcy court did not address this question, but that court's findings of fact provide sufficient basis for us to apply the legal standard for inequitable conduct in the course of deciding this appeal. See Fowler Bros. v. Young (*In re* Young), 91 F.3d 1367, 1373 (10th Cir. 1996). The dispute between the parties at this stage is not over the facts of the Bronze Group transaction but over how those facts ought to be characterized as a legal matter. We therefore deny Appellants' request for a remand.

- 22 -

the Bronze Group loan subordinated to equal "cash-in cash-out" treatment with HIA's equity investors.

## IV.    Conclusion

Because we conclude that the Bronze Group loan with HIA satisfies neither the criteria for recharacterization as an equity investment nor the standard for equitable subordination, we AFFIRM the judgment of the district court granting the Bronze Group recovery of its remaining principal balance and accrued pre-petition interest.