PHILLIPS, Circuit Judge,
dissenting:
I would affirm the bankruptcy court’s decision to recharacterize the loans as equity. Absent our doing that, I would remand the question of whether Mr. Jenkins has a valid security agreement against the Cabanas litigation proceeds. Because we do not remand that question, I explain why I believe the existing record does not support a finding that Mr. Jenkins has a secured claim.
I. Recharacterization
I begin by recognizing a simple fact: Mr. Jenkins was not funding Alternate Fuels, Inc. (AFI) to keep a struggling business afloat in hopes that it might later make money. Instead, for his financial benefit and not AFI’s, he funded AFI solely so that it could meet its obligation to reclaim coal lands in accordance with its promise to the State of Missouri. In short, by buying AFI, Mr. Jenkins made a business gamble — he bet that he would spend less helping AFI reclaim the coal land than he would make from his collecting 24 certificates of deposit worth about $1.4 million that he had bought from AFI’s previous owner, Mr. Warmack, who had pledged the certificates of deposit against the reclamation bonds. See In re Alternate Fuels, Inc., Bankr. No. 09-20173, 2012 WL 6110429, at *3 n. 6 (Bankr. D.Kan. Dec. 10, 2012) (unpublished) (“In re Alternate Fuels I ”). Also as part of his business calculation, Mr. Jenkins knew that by buying AFI he was also obtaining Cimarron’s equipment (of which his purchased share was 99%) worth between one and two million dollars. See In re Alternate Fuels, Inc., 507 B.R. 324, 328-29 (B.A.P. 10th Cir.2014) (“In re Alternate Fuels II”).
As noted in In re Hedged-Investments Assocs. Inc., 380 F.3d 1292, 1297 (10th Cir.2004), when a bankruptcy court rechar-acterizes a loan, it “effectively ignore[s] the label attached to the transaction at issue and instead recognize[s] its true sub *1157 stance.”[1] The effect is that “[t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as a corporate debt, but are instead treated as a capital contribution.” Id. In evaluating whether “funds advanced to a now-bankrupt entity were true loans or camouflaged equity investments,” we consider a nonexclusive list of thirteen factors:
(1) the names given to the certificates evidencing the indebtedness;
(2) the presence or absence of a fixed maturity date;
(3) the source of payments;
(4) the right to enforce payment of principal and interest;
(5) participating in management flowing as a result;
(6) the status of the contribution in relation to regular corporate creditors;
(7) the intent of the parties;
(8) “thin” or adequate capitalization;
(9) identity of interest between the creditor and stockholder;
(10) source of interest payments;
(11) the ability of the corporation to obtain loans from outside lending institutions;
(12) the extent to which the advance was used to acquire capital assets; and
(13) the failure of the debtor to repay on the due date or to seek a postponement.
Id. at 1298 (citing Stinnett’s Pontiac Serv., Inc. v. Comm’r of Internal Revenue, 730 F.2d 634, 638 (11th Cir.1984)).
Both the bankruptcy court and the Bankruptcy Appellate Panel weighed these factors under the facts of this case and determined that Mr. Jenkins’s loans should be recharacterized as equity investments. See In re Alternate Fuels II, 607 B.R. at 327. The majority disagrees with their analyses, reweighing the factors and concluding that Mr. Jenkins made loans and not equity investment. Because I believe that the bankruptcy court more properly applied the Hedged-Investments factors and better followed the case’s underlying policies, I would affirm the bankruptcy court’s decision recharacterizing the loans as equity.
In evaluating the thirteen factors, I note that they fall into two general categories— first, whether the transaction documents signal debt; second, if so, whether the loans are really just disguised equity investments. Thus, I break the 13 factors into these two categories and consider where the factors point. After doing so, I conclude that the bankruptcy court was correct to recharacterize the loans as equity investment. Further, after considering the factors and the underlying facts of this case, I disagree with the majority’s decision to treat Mr. Jenkins as a business owner who was trying to nurse a struggling business back to survival and profitability. That presents a mistaken view that diverts the analysis in the wrong direction, miscasting Mr. Jenkins in a role unfitting him here — as an owner trying to help his business survive during a tough time. When such a business owner brings a case to us, we can consider it under our 13 factors independently of whatever result we reach for Mr. Jenkins based on his far different circumstances.
*1158 1. Is there an appearance of debt?

a.Factor 1: The names given to the certificates evidencing the indebtedness

I agree with the majority that this factor weighs in favor of a finding of debt. The names of the instruments evincing debt (promissory notes) “are plainly instruments of indebtedness.” Maj. Op. at 1149-50. I also agree that this remains so despite the parties not completing all portions of the preprinted promissory-note forms. Id. Moreover, contrary to the Bankruptcy Appellate Panel, I agree with the majority that the notes are not rendered invalid merely because they “roughly reflect” the advances that Mr. Jenkins made. Maj. Op. at 1150. I disagree with the bankruptcy court’s view that, because AFI had no realistic ability to pay the debt on the first three notes, this factor only superficially favors loans and not equity. The name “promissory notes” suggests indebtedness. ■ This factor does not set an onerous standard, and Mr. Jenkins meets it.

b.Factor 2: The presence or absence of a fixed maturity date

I agree with the majority that the notes set a fixed maturity date, see Maj. Op. at 1151-52, but for a slightly different reason. I believe that the notes require payment no later than five years after their execution. That the payment might become fully due “upon reclamation bond release” or, with the fourth note, also “upon ... proceeds from lawsuit,” contemplates possible payment before five years have passed from execution of the notes. Supporting this view that the two contingencies did not indeterminately extend the due date past five years, I read the contingencies as being consistent with the fourth note’s direction that the “[p]rincipal balance plus accrued interest shall be due and payable on or before five (5) years from the date shown above-” Appellants’ App., vol. VI, at 1151 (emphasis added).
c.Factor J: The right to enforce payment of principal and interest
I agree with the majority that Mr. Jenkins had a right to enforce payment on his notes regardless of whether AFI had any assets. In my view, as in the majority’s, it is unimportant under this factor that Mr. Jenkins did not exercise his contractual right to enforce payment when it became due. Maj. Op. at 1151-52. I agree with the majority that “[t]he fact that he did not exercise this contractual right does not render it meaningless.” Id. In my view, the bankruptcy court confuses Mr. Jenkins’s “right” to enforce payment with his “ability” to do so. Because the factor does not ask about the debtor’s ability to pay, the bankruptcy court erred by discounting this factor because in its view the “right was illusory.” In re Alternate Fuels I, 2012 WL 6110429, at *11.
2. Is there a reality of debt based on the conduct, knowledge, and intent of the parties?

a. Factor 8: The source of the payments

The majority does not discuss this factor. The bankruptcy court does though, concluding that it “strongly indicates a capital infusion.” Id. at *11. “The question is whether the lender has any reasonable expectation of payment if the business fails.” In re Lexington Oil & Gas Ltd., Co., 423 B.R. 353, 366 (Bankr.E.D.Okla. 2010). In evaluating this question, the bankruptcy court found that AFI “had no business other than the completion of reclamation,” which reclamation “would not generate revenue for AFI, but it would result in the release of the Certificates of Deposit which were assigned to the Jen- *1159 kinses and were looked to by the parties as the source of payment of the Notes.” In re Alternate Fuels I, 2012 WL 6110429, at *11. When we eliminate the certificates of deposit as a source of repayment of the three loans because they already belonged to Mr. Jenkins, no source of repayment remained. In that setting, I agree with the bankruptcy court that this factor favors a finding of investment equity and not loans.

b.Factor 5: Participation in management flowing as a result

Because Mr. Jenkins did not increase his participation in management because of the asserted debt AFI owed on the promissory notes, the majority contends that this factor favors Mr. Jenkins and a finding of loans. I am unpersuaded. We must remember that Mr. Jenkins owned one-hundred percent of AFI and could manage it as he pleased. I cannot see how his inability to manage it beyond one-hundred percent favors either side’s argument. In that situation, I say this factor is neutral and favors neither side.

c.Factor 6: The status of the contribution in relation to regular corporate creditors

The majority ignores this factor, and the bankruptcy court deemed it irrelevant. See id. at *10. I do not weigh it in favor of either party.

d.Factor 7: The intent of the parties

Although not directly saying so, the bankruptcy court appears to have weighed this factor in favor of investment equity and not loans. It found that “Jenkins never intended the loans to be paid by AFI.” Id. at *11. This sounds like a finding of fact subject to the clear error standard. See In re Blinder, Robinson & Co., Inc., 124 F.3d 1238, 1241 (10th Cir.1997). And because AFI lacked any prospect of ever obtaining any assets when the first three notes were signed, I disagree with the majority that the bankruptcy court erred in its finding. See Maj. Op. at 1152. Indeed, the bankruptcy court bolstered its finding by quoting Jenkins’s own stipulation that the “real purpose of the [three Notes] ... was to secure Jenkins[’s] investments in AFI and Cimarron.” In re Alternate Fuels I, 2012 WL 6110429, at *6. I gather that the bankruptcy court reads this as saying that Jenkins’s three notes served solely to doubly-ensure that his personally-owned certificates of deposit were safe from AFI’s many creditors. That reading is also consistent with Mr. Pommier’s testimony that, “if Mr. Jenkins received the proceeds of the release of the certificates of deposit upon the completion of reclamation, AFI would owe no money on the note.” Maj. Op. at 1144 (citing. Appellant’s App., vol. IV, at 697).
But here the majority takes a different view, saying that “the evidence indicates that [Jenkins] intended the notes to be satisfied pursuant to their second clause: ‘upon reclamation bond release by the State of Missouri.’ ” Maj. Op. at 1152. If the majority is suggesting that the notes were to be repaid from the $1.4 million of certificates of deposit, it fails to explain why Mr. Jenkins would repay himself from his personally owned certificates of deposit. And if the majority indeed reads this promissory-note language as requiring repayment from the certificates of deposit, the bankruptcy court on remand should first apply the $1.4 million against Mr. Jenkins’s proof of claim before looking to AFI’s other assets.[2]
*1160 The fourth note incorporates and cumu-lates the principal and interest owed on the first three notes. But any debt owed on the first three notes was old debt. While the bankruptcy court and majority agree that consideration (the promise to provide further funds to reclaim the coal property) supported the fourth note, I believe that consideration would support only a loan for newly lent money, not for money already lent and spent. Before I could agree that Mr. Jenkins can so easily cut ahead of AFI’s other creditors, I would need to see some legal justification allowing it. Absent that, I believe the intent of the parties favors a finding that the loans in reality were equity investment.

e.Factor 8: “Thin” or inadequate capitalization

The majority finds “no support” for the bankruptcy court’s conclusion that this factor favored recharacterization. Maj. Op. at 1151. Instead, the majority suggests . that the bankruptcy court placed too heavy an emphasis on undercapitalization in using this factor to favor recharacterization. See Maj. Op. at 1152. No one disputes that AFI was inadequately capitalized to engage in coal mining. Its lack of capital or any other assets certainly made any repayment unrealistic. I agree with the majority that heavily emphasizing “under-capitalization in our recharacterization analysis would create an ‘unhealthy deterrent effect,’ causing business owners to fear that, should their ‘rescue efforts’ fail, a court will ‘give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.’ ” Maj. Op. at 1152 (quoting In re Hedged-Investments, 380 F.3d at 1298 n. 1). But that concern simply does not apply here. In a case like the majority describes, I would wholeheartedly agree to discount this factor. In a case like this one, however, where Mr. Jenkins was in no way seeking to “rescue” AFI, it is wrong to underem-phasize this factor for him because it might weigh too heavily against others unlike him. I agree with the bankruptcy court that this factor favors a finding of investment equity and not debt.

f.Factor 9: Identity of interest between the creditor and stockholder

The majority again finds “no support” for the bankruptcy court’s reliance on this factor to support investment equity instead of loans. Maj. Op. at 1151. While agreeing that “this factor may indicate a capital contribution when two or more shareholders own debt in the same proportion as their underlying equity interests,” the majority declares that “the same reasoning does not automatically apply when a single shareholder owns the entirety of a company’s stock.” Id. Because Mr. Jenkins owns 100% of AFI and provided all funds to it, I agree with the bankruptcy court that “[a]n equity contribution is indicated.” In re Alternate Fuels I, 2012 WL 6110429, at *12.

g.Factor 10: Source of interest payments

The majority is silent on this factor, and the bankruptcy court deemed it irrelevant because AFI paid no interest payments. Id. at *10. I believe it favors neither party.

h.Factor 12: The extent to which the advance was used to acquire capital assets

The bankruptcy court says that this factor superficially weighs in favor of a loan because Mr. Jenkins’s money was used to fund operating expenses and not to acquire *1161 capital assets. Id. at *10. It gives this factor “reduced significance” because AFI in reclamation-mode had only operating expenses and did not acquire capital assets. Id. Even so, the factor itself does not delve into the reasons a business expends funds one way or the other — it simply asks how they were spent. Because the funds here were spent on operating expenses, I agree with the majority that this factor weighs in favor of debt, although not nearly so much as in an ordinary ongoing-business situation.
Finally, this brings us to two factors the majority concedes support the bankruptcy court’s view that the Jenkins loans were equity investment and not loans.

i. Factor 11: The ability of the corporation to obtain loans from outside lending institutions

The majority notes that Mr. Jenkins tried and failed to obtain loans from outside lending institutions on behalf of AFI. Maj. Op. at 1152. It further observes that “[w]hen there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.” Maj. Op. at 1152 (quoting In re AutoStyle Plastics, Inc., 269 F.3d 726, 752 (6th Cir.2001)). In view of AFI’s financial condition, Mr. Jenkins’s failure to find outside lenders was hardly a surprise. This factor supports the bankruptcy court’s decision recharacterizing Mr. Jenkins’s loans as investment equity.

j. Factor 13: The failure of the debtor to repay on the due date or to seek a postponement

The majority agrees that this factor favors recharacterization because “AFI did not pay the notes by their five-year maturity dates and did not seek an extension.” Maj. Op. at 1152. Again, it is not just the failure to pay that weighs in favor of investment equity and against loans. It is also why AFI did not pay. Quite simply, AFI had no ability to pay the debts when due, and Mr. Jenkins knew when he wrote the promissory notes that this would happen. Again, this factor supports the bankruptcy court’s decision to recharacterize the loans as investment equity.
3. Considering the 13 Factors as a Whole
By my count, seven factors weigh in favor of recharacterization of the loans as investment equity, three factors in favor of treating the loans as debt, and three factors as neutral. Those factors favoring Mr. Jenkins largely concern the name and form of the promissory notes, and those against him concern the real-world backdrop behind the notes. Despite Mr. Jenkins’s promissory-note forms suggesting debt, little else does. Mr. Jenkins entirely owned AFI and had it sign promissory notes it could not pay or hope to pay. Unlike with arms-length promissory notes, the object was not repayment, but instead was to protect Mr. Jenkins’s 24 certificates of deposit from AFI’s creditors and later to elevate his claims under the notes to a secured status. On balance, under these circumstances, the Hedgedr-Investments factors support the bankruptcy court’s re-characterization of the loans as investment equity.
In concluding otherwise, the majority relies on a policy of encouraging (or at least not discouraging) hypothetical business owners — unlike Mr. Jenkins — who lend their businesses money to keep them running in hopes of future profits. In this regard, the majority urges caution on grounds that “[w]e have been careful not to ‘discourage owners from trying to salvage a business’ by requiring ‘all contributions to be made in the form of equity capital.’ ” Maj. Op. at 1153 (quoting In re Mid-Town Produce Terminal, Inc., 599 *1162 F.2d 389, 392 (10th Cir.1979)). Similarly, it notes that “[i]ndeed, owners may often be ‘the only party willing to make a loan to a struggling business,’ In re Dornier Aviation [(North America), Inc.], 453 F.3d [225,] 234 [ (4th Cir.2006) ], and needlessly punishing their efforts is neither ‘desirable as social policy’ nor required by our precedent. In re Mid-Town Produce, 599 F.2d at 392.” Maj. Op. at 1153.
While those are sensible policies in those sorts of cases, this case does not fit that bill. Here, Mr. Jenkins was in no way lending to sustain or revive a struggling business. Giving him the benefit of policies assuming that he was doing so skews the Hedged-Investments analysis. Thus, I disagree with the majority that the “unique circumstances of this case” justify treating Mr. Jenkins’s money advances as loans under Hedged-Investments. Maj. Op. at 1153. Instead, I believe that the actual circumstances here (Mr. Jenkins’s advancing AFI money not to mine coal but instead to reclaim coal lands so Mr. Jenkins could obtain release of his certificates of deposit) favor recharacterizing the loans as equity investment.[3]
II. Security Agreement
Although not elaborating, the bankruptcy court concluded that Mr. Jenkins has “not sustained [his] burden of proof as to the validity and amount of [his] claims.” In re Alternate Fuels I, 2012 WL 6110429, at *18. The Trustee had objected to Mr. Jenkins’s claim, arguing that “[t]he Jenkins Claim lacks sufficient documentation or proof of a valid claim (i) in the amount of the claim asserted; (ii) the consideration received by AFI; and/or (iii) the secured nature of the claim asserted.” Appellants’ App., vol. 1, at 182.[4] Unfortunately, the bankruptcy court did not explain in any detail whether or how Mr. Jenkins’s alleged “security” interest in AFI’s judgment proceeds was sufficient or insufficient. Unlike the majority, I believe that, by contesting the claim in these terms, the Trustee raised the issue sufficiently for us to consider the .validity of the claimed security interest.
I doubt whether any of Mr. Jenkins’s four promissory notes established a security agreement under Kansas law, and accordingly I doubt whether he can jump ahead of AFI’s unsecured creditors’ claims totaling about $5.7 million. Rather than decide the issue on appeal, I believe we should remand for the bankruptcy court to reach a reasoned decision on the issue, a decision we could later more meaningfully review. Because the majority prefers to press ahead, I will simply note my concerns and their bases.
“Before a security interest may be enforced against the debtor, certain formal requirements must be met.”[5] Maxi Sales *1163 Co. v. Critiques, Inc., 796 F.2d 1293, 1297 (10th Cir.1986) (applying Kansas law to determine whether a creditor in a bankruptcy proceeding had a secured interest). First, the debtor must have signed a written security agreement “that provides a description of the collateral.” Kan. Stat. Ann. § 84-9-203(b)(3)(A). Second, the creditor must give value. Id. § 84-9-203(b)(1). Third, the debtor must have rights in the collateral. Id. § 84-9-203(b)(3)(A). Here, a remand would help us tell whether these conditions are met. Because the majority reverses the bankruptcy court’s holding that the loans should be recharacterized as investment equity and not debt, the unsecured creditors have a great interest in knowing whether AFI is a secured or unsecured creditor.
In my view, based on the record, the fourth promissory note likely does not meet the requirements of a security agreement under Kansas law. I note that Mr. Jenkins did not even include this “renewal” note as part of his proof of claim. Nor do I see why he would have done so — in my view, the fourth promissory note does not describe as collateral either the Cabanas lawsuit’s possible judgment proceeds or the $3 million Cabanas lawsuit assignment. Instead, as I read its terms, the renewal note simply adds an additional time before five years have elapsed at which payment might become due. By my reading, the note sets an outer limit of five years in which to pay, and provides two possible earlier payment due dates — “upon reclamation bond release by the State of Missouri” or “upon ... proceeds from the [Cabanas ] lawsuit....” This fourth note (March 1, 2003) contains the stock language of the three earlier notes, but it adds the language I italicize below:
Principal balance plus accrued interest shall be due and payable on or before five (5) years from the date shown above at Route 2 Box 97 Adrian, Missouri 64720. This note shall be paid in full upon reclamation bond release from the State of Missouri or proceeds from lawsuit filed in Federal Court case no 02CV1182 said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Bound Mine.
Appellants’ App., vol. VI, at 1151 (emphasis added).
I cannot see how this language creates a security interest in “collateral” of the certificates of deposit or of assignment of the Cabanas lawsuit proceeds. First, for the certificates of deposit, any such reading would make no sense. As the majority notes, Mr. Jenkins, and not AFI, personally owns the $1.4 million dollars in certificates of deposit. Maj. Op. at 1144. Surely AFI was not to pay its substantial debt to Mr. Jenkins from his own property. Second, as with the certificates of deposit, this language does not say that Mr. Jenkins is entitled to repayment from the “proceeds from lawsuit.” Instead, Mr. Jenkins’s note — and we should remember he wrote it — provides that the note was due upon “proceeds from lawsuit.” In my view, Mr. Jenkins’s word choice of “upon” instead of “from” fails to identify collateral in a security agreement. Instead, it simply identifies an alternative, earlier moment in time when payment might become due.
Nor does the 2003 renewal note identify as collateral the $3 million assignment AFI made to Mr. Jenkins that same day. Similarly, the assignment does not mention the renewal note. This complicates any effort to combine the two instruments to fashion *1164 or find a security interest in the identified collateral. I see nothing in any promissory note describing collateral sufficiently to satisfy Kan. Stat. Ann. § 84-9-203(b)(2).
Because the 2003 renewal note and the Cabanas assignment are distinct, Mr. Jenkins must attempt to recover from them separately. Even with the majority’s decision not to recharacterize the loans as equity, Mr. Jenkins still should be left to recover from his promissory notes as part of the group of unsecured creditors. As for the Cabanas lawsuit assignment, “[t]he general rule is that an assignee of a nonnegotiable chose in action acquires no greater right than was possessed by his assign- or, and simply stands in the shoes of the latter.” Carson v. Chevron Chem. Co., 6 Kan.App.2d 776, 635 P.2d 1248, 1260 (1981); see also 6 Am.Jur.2d. Assignments, § 108 (2d ed. 2015) (“As a general rule, an assignee takes the subject of the assignment with all the rights and remedies possessed by or available to the assignor.”). For these reasons, I respectfully dissent.

. For all reasons advanced in the majority opinion, I agree that In re Hedged-Investments remains good law even after the decisions in Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007), and Law v. Siegel, - U.S. -, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014).

. Mr. Jenkins sought outside lending to fund the reclamation, but no outside lenders were willing to lend money. Had an outside lender been found, it would have made sense that its promissory note would have included the certificates of deposit as collateral. Whether the promissory notes here are a vestige of that *1160 earlier lending attempt is unknown from the record.

.I do not agree with the majority that any of my analysis would mean that we are “empowered to pick winners and losers based upon our view of the social utility of their underlying business.” Maj. Op. at 1153. New would doubt the social utility of reclaiming lands used for coal mining. Instead, what the analysis suggests is that a business owner funding a struggling business is more apt to intend to seek repayment on his advanced funds than a business owner like Mr. Jenkins who lent money to an otherwise moribund business with his own independent financial incentive without hope of the moribund business ever paying him back.

. The bankruptcy court referenced the objection on the three bases asserted by the Trustee. Alternate Fuels I, 2012 WL 6110429, at *17.

. Section 101 of the Bankruptcy Code defines "security agreement” (agreement that creates or provides for a security interest), "security interest” (lien created by agreement), and "lien” (charge against or interest in property to secure payment of a debt or performance of an obligation). 11 U.S.C. § 101(50), (51), and (37), respectively. The definitions section of the Kansas secured transactions statutes defines "secured party” as a "person in whose favor a security interest is created or *1163 provided for under a security agreement, whether or not any obligation to be secured is outstanding.” Kan. Stat. Ann. § 84-9-102(a)(71)(A). And it has the same definition for "security agreement” as the Bankruptcy Code. Id. § 84-9-102(a)(72).